**MUNICIPALITY OF ANCHORAGE, POLICE AND FIRE RETIREMENT BOARD, Appellant,**

v.

**Lisa COFFEY, Appellee.**

No. S–6136.

Supreme Court of Alaska.

April 14, 1995.

Robert D. Klausner, Klausner & Cohen, Hollywood, Florida and Allan E. Tesche, Russell, Tesche & Wagg, Anchorage, for appellant.

David W. Baranow, Anchorage, for appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

*OPINION*

COMPTON, Justice.

I. *INTRODUCTION*

Lisa Coffey petitioned the Municipality of Anchorage Police and Fire Retirement Board (Board) for permanent occupational disability benefits under Plan III of Anchorage Municipal Code (AMC) 3.85.230. The Board denied her claim and awarded her non-occupational benefits under AMC 3.85.240. Ms. Coffey appealed the Board's decision to the superior court. AS 22.10.020(d); Alaska R. Appellate P. 602. The superior court reversed the Board's decision. It concluded that there was not substantial evidence to support the Board's conclusion that Ms. Coffey's disability was non-occupational. The Board appeals. We affirm.

II. *FACTUAL AND PROCEDURAL BACKGROUND*

A. FACTUAL BACKGROUND

Lisa Coffey was employed as a police officer and call taker by the Municipality of Anchorage Police Department (APD) for approximately six years. On January 1, 1990, she was attempting to make an arrest. She was knocked down and kicked in the left shoulder blade area by the arrestee. She was wearing a three-to-four pound Kevlar protective vest when she was kicked. Ms. Coffey sought treatment from Dr. James C. Emerson, a chiropractor, for the injuries she sustained in this episode. Although the parties do not agree when Dr. Emerson began treating Ms. Coffey's left shoulder, Dr. Emerson's chiropractic records from January 2, 1990 show that Dr. Emerson adjusted Ms. Coffey's left hip and thoracic area, set her

jaw, and took an x-ray of her lumbar region the day after the accident.[1] After four months of treatment Dr. Emerson released Ms. Coffey to return to full duty.

After being released by Dr. Emerson, Ms. Coffey returned to full duty until August of that year. During this time she worked regular shifts for the APD with no medical restrictions. She claims that she continued to experience nagging minor symptoms in varying degrees during this period, although there is no record of medical treatment. In August Ms. Coffey reported to Dr. Denise Z. Anderson, her family physician, that she had experienced pain and numbness in her left arm. Dr. Anderson referred Ms. Coffey to Dr. Robert Fu, a physiatrist, for testing. After evaluating Ms. Coffey's condition, Dr. Fu diagnosed Ms. Coffey as suffering from thoracic outlet syndrome. He recommended that Ms. Coffey change occupations.[2]

Ms. Coffey worked light duty in the training department from September 1990 through December 1991. During this period the physicians treating her never released her to return to full duty. In December the APD terminated Ms. Coffey from her sworn position as a patrol officer and rehired her in a non-sworn position as a call taker. In September 1992, Ms. Coffey's primary physician, Dr. Chang–Zern Hong, took her off this light-duty work. He reasoned that her job duties, combined with the stress of pressing her claim before the Board, rendered her incapable of continuing to work as a call taker.

In addition to Doctors Emerson, Anderson, Fu, and Hong, Ms. Coffey has consulted with at least thirteen other physicians and health care providers.[3] She conferred with many of

---

1. Ms. Coffey claims that the x-ray indicates that she was treated for severe back pain as early as January 2, 1990. Conversely, the Board claims that there is no record of left shoulder treatment until a notation by Dr. Emerson made on January 17, 1990. This notation suggests that Dr. Emerson had already begun treatment of Ms. Coffey's shoulder. The note states that Ms. Coffey is "feeling better with improved range of motion and much reduced shoulder pain." The notation does not suggest that onset of the pain was the reason for the appointment, particularly in light of Dr. Emerson's January 2 notation.

2. The Board found it significant that Ms. Coffey does not remember whether she told Dr. Fu that she had previously pulled her shoulder muscles and is sure that she did not inform him of a diagnosis of mild myofascial pain syndrome made by Dr. Anderson in 1987.

3. These other health care providers included: Dr. David M. Dietz, Ms. Linda I. Glick, Dr. Paul L. Craig, Dr. Ronald E. Mertens, Dr. Kenneth M. Wilson, Dr. Paul J. Duewelius, Dr. John N. Porter, Dr. Lee S. Glass, Dr. Hubert L. Rosomoff, Dr. Alan Saltzman, Dr. Morris R. Horning, Dr. Bruno M. Kappes, and Dr. Lawrence M. Blume.

these at the request of the Board. In summarizing the testimony and diagnoses given by these physicians and health care providers, the Board's own physician, Lee Glass, J.D., M.D., stated that virtually all of the physicians agreed that Ms. Coffey's current complaints are secondary to trauma. Dr. Glass emphasized that all of the physicians directly or by implication pointed to the incident of January 1, 1990 as the cause of Ms. Coffey's chronic pain complaints. Dr. Glass further remarked that no health care provider had identified an alternative etiology for Ms. Coffey's condition.

Although Ms. Coffey's medical history prior to January 1, 1990, is largely undisputed, it is significant because the etiology of her disability is at issue. Most relevant to this dispute are four injuries which Ms. Coffey sustained to her back and neck prior to 1990: (1) in 1985 Ms. Coffey sustained a strained right shoulder muscle in a physical training class; (2) in 1986 she pulled a shoulder and neck muscle or nerve while assisting an off-duty officer; (3) in 1987 she pulled a muscle on the right side of her lower back while breaking up a fight; and (4) in 1989 she experienced pain and limited movement of her right shoulder after lifting a toilet bucket.

Ms. Coffey sought medical attention for these injuries from both Dr. Emerson and Dr. Anderson.[4] The Board specifically notes the importance of three entries in Ms. Coffey's medical history: (1) in 1987 Dr. Emerson recorded that Ms. Coffey was complaining of pain under her right shoulder blade; (2) as early as 1987 Dr. Anderson diagnosed Ms. Coffey with "mild myofascial syndrome;" and (3) in 1989 Ms. Coffey sought treatment from Dr. Anderson because she could not lift her arm and had difficulty turning to the right.

4. Both parties also note that over the course of her employment as a law enforcement officer, Ms. Coffey made workers' compensation claims for a tailbone fracture, a broken nose, a fractured wrist and a pulled shoulder muscle.

5. AMC 3.85.230 (1989).

6. It is the usual rule that when the superior court, sitting as an intermediate appellate court, remands a case to the administrative agency for

## B. PROCEDURAL HISTORY

On May 23, 1991 Ms. Coffey applied for permanent occupational disability benefits under the Municipality of Anchorage Police and Fire Retirement Plan III.[5] The Board awarded Ms. Coffey temporary occupational disability benefits. After further investigation, the Board concluded that Ms. Coffey had failed to prove by a preponderance of the evidence that her disability was permanent. On this theory it denied permanent disability benefits. Ms. Coffey appealed the Board's decision, and under AMC 3.85.004(C) (1993) requested a formal administrative hearing.

At the conclusion of the formal administrative hearing the Board reversed its prior ruling on the permanency of Ms. Coffey's disability and concluded that she was permanently disabled. However, the Board also found that Ms. Coffey had failed to prove by a preponderance of the evidence that her disability was occupationally related. The Board ordered that Ms. Coffey receive permanent non-occupational disability benefits. These benefits are significantly less than occupational benefits. *See* AMC 3.85.230, 3.85.240 (1989).

■ Ms. Coffey appealed to the superior court the issue of whether her disability was non-occupational. The superior court reversed the Board's determination and ordered the Board to award Ms. Coffey permanent occupational disability benefits. The Board appeals.[6]

## III. *DISCUSSION*

### A. STANDARD OF REVIEW

■ We review the merits of the Board's administrative determination *de novo*. When we review a decision of the

further proceedings, the remand is not a final judgment from which an appeal may be taken. *City & Borough of Juneau v. Thiboudeau*, 595 P.2d 626, 629–30 (Alaska 1979). However, we will review the remand in this case because its effect was to order the Board to perform a ministerial act, *i.e.*, enter an order directing payment of permanent occupational benefits to Ms. Coffey. This is sufficient to constitute a final judgment for the purpose of Appellate Rule 202.

superior court sitting as an intermediate court of appeal, we give no deference to the superior court's decision. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

■ There are four recognized standards employed to review administrative decisions: "the 'substantial evidence' test for questions of fact; the 'reasonable basis' test for questions of law involving agency expertise; the 'substitution of judgment' test for questions of law where no expertise is involved; the 'reasonable and not arbitrary' test for review of administrative regulations." *Jager v. State*, 537 P.2d 1100, 1107 n. 23 (Alaska 1975).

■ Both parties and the superior court agree that this case should be reviewed under the substantial evidence test. We concur, because the only Board ruling at issue is its determination concerning the etiology of Ms. Coffey's disability. The question of whether Ms. Coffey's disability was the result of an injury she received while making an arrest on January 1, 1990 is purely a question of fact.[7] The substantial evidence test requires this court to determine "whether there is substantial evidence, in light of the whole record, such that a reasonable mind might accept the board's decision." *State, Pub. Employees Retirement Bd. v. Cacioppo*, 813 P.2d 679, 682–83 n. 6 (Alaska 1991) (*citing Delaney v. Alaska Airlines*, 693 P.2d 859, 863 (Alaska 1985) *overruled on other grounds, Wade v. Anchorage School Dist.*, 741 P.2d 634, 638–39 (Alaska 1987)). When applying the substantial evidence test the court does not independently reweigh the evidence. *Yahara v. Construction & Rig-*

*ging, Inc.*, 851 P.2d 69, 72 (Alaska 1993). The court should only determine whether such evidence exists, and not choose between competing inferences. *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992); *Interior Paint Co. v. Rodgers*, 522 P.2d 164, 170 (Alaska 1974).

> Whatever type of evidence is offered, whether affirmative, negative or otherwise relevant, the crucial question after considering the whole record remains whether the quantum of evidence is substantial enough to support a conclusion in the contemplation of a reasonable mind. The question whether the quantum of evidence is substantial is a legal question.

*Land & Marine Rental Co. v. Rawls*, 686 P.2d 1187, 1188–89 (Alaska 1984) (citations omitted).

> Therefore, if the Board is faced with two or more conflicting medical opinions—each of which constitutes substantial evidence—and elects to rely on one opinion rather than the other, we will affirm the Board's decision.

*Yahara*, 851 P.2d at 72.

## B. THE BOARD'S RULING WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

■ Under the Anchorage Municipal Code the Board must "determine whether an occupational disability exists based upon medical records and other evidence satisfactory to the Retirement Board." AMC 3.85.230(B) (1989). The issue before this court is whether there was substantial evidence upon which the Board could have concluded that Ms. Coffey's injuries were not occupationally related.[8]

---

7. In addition to arguing for the application of the substantial evidence test, Ms. Coffey also contends that pursuant to AS 44.62.570 this court may exercise its independent judgment on the evidence. However, as the Board correctly notes, this contention is based upon the mistaken belief that AS 44.62, the Administrative Procedure Act (APA), should dictate the scope of review employed in this case. Alaska Statute 44.62.570 does not apply. Alaska Statute 44.62.330(b) specifically limits coverage of the APA to agencies either listed in AS 44.62.330(a) or made subject to the APA by other statutes. *Galt v. Stanton*, 591 P.2d 960, 962 n. 8 (Alaska 1979); *see also, Hertz v. Carothers*, 784 P.2d 659,

660 (Alaska 1990). The Board is not among the agencies enumerated, nor is it made subject to the APA by another statute. *See* AS 44.62.330; AMC 3.85.010–.095 (1990).

8. The issue is not, as the Board argues, whether there was substantial evidence upon which the Board could have concluded that Ms. Coffey did not carry her burden of proof at the administrative hearing. Both parties agree that an applicant seeking benefits from the Retirement Board bears the burden of proving all of the elements required by AMC 3.85.230 and any implementing regulations. This differs from the workers' compensation system where there is a presumption

Although the Board's ruling contradicts all of the medical evidence presented at Ms. Coffey's hearing, the Board asserts that its decision that Ms. Coffey's injury was not occupationally related was based on substantial evidence. The Board offers seven rationales for its decision not to award Ms. Coffey occupational disability benefits. We address them seriatim.

First, the Board argues that its decision was substantially motivated by its belief that Ms. Coffey "simply was not telling the truth." Its basis for this conclusion is Ms. Coffey's admission that she never told any of the examining physicians about her prior shoulder injuries.

Second, the Board argues that none of the physician's diagnoses are reliable because they are all based on insufficient evidence. The Board claims that Doctors Fu, Hong, and Rosomoff had no knowledge of the toilet bowl incident for which Ms. Coffey was hospitalized. It also avers that Dr. Hong testified that he did not weigh prior possible causes when rendering his medical opinion. The Board gives no record cite to substantiate these claims. The closest it comes to identifying evidence supporting its position is testimony by Ms. Coffey that she had not told any of the examining physicians that she had been diagnosed with myofascial pain syndrome in 1987. The Board omits the remainder of Ms. Coffey's testimony in which she explains that until she testified she had been unaware that in 1987 she had been diagnosed with this condition.

The Board further emphasized Dr. Rosomoff's testimony, which recognized that in making a diagnosis a physician is at the mercy of what a patient tells him. Dr. Rosomoff actually testified that he is at the mercy of what the patient tells him, or of whatever medical records exist. Regardless of what Dr. Rosomoff said, none of the physicians relied solely on Ms. Coffey's description of her symptoms in creating their diagnoses. They all used her medical records, independent testing, and observations. At the time they examined Ms. Coffey all of the physi-

cians, except for the emergency room physicians, had access to her medical records. Dr. Hong even testified that he may have been aware of Dr. Anderson's 1987 diagnosis of myofascial pain syndrome, and that he definitely knew that Ms. Coffey had experienced other trauma previous to the January 1990 incident. Similarly, Dr. Rosomoff clearly had Ms. Coffey's medical records because he later noted that although she did not tell him that she had fractured her arm, he was aware of this injury. Dr. Rosomoff noted that there had been inconsistencies in the descriptions Ms. Coffey gave to him, but that this was typical of patients.

Third, the Board relied on a statement by Dr. Rosomoff that myofascial pain syndrome can be hereditary, and thus need not be caused by trauma. However, Dr. Rosomoff went on to testify:

> this depends entirely on Lisa Coffey's testimony unless you have facts before you, that I know nothing about, she tells me that this began with her altercation, I have to accept from there on out that all of the sequence of events that followed, were due to that cause.

Dr. Rosomoff never testified that Ms. Coffey's injury was hereditary. The only causal diagnosis he made linked her injury to the January 1, 1990 injury.

Fourth, the Board focused on the three-to-four pound Kevlar body armor which Ms. Coffey was wearing at the time she was kicked. The Board asserts that Dr. Hong stated that because of the vest, the kick could not have caused her disability. What Dr. Hong said in fact was that because of the vest it is unlikely that the impact of the kick was the cause of the disability. He hypothesized that it is not unlikely that Ms. Coffey's condition was the result of her falling when she was kicked. Additionally, Dr. Rosomoff testified that he had treated other officers who had incurred injuries similar to Ms. Coffey's while wearing Kevlar vests.

Fifth, the Board argues that the fact that Ms. Coffey sought no medical attention for

of compensability. *State, Pub. Employees Retirement Bd. v. Cacioppo*, 813 P.2d 679, 683 (Alaska 1991).

pain from April through August 1990 is inconsistent with her disability having its onset in January 1990. The Board relies on notes taken by Linda Glick, a physical therapist, which report that Coffey suffered no physical problems from April to August 1990. However, both Doctors Rosomoff and Hong testified that this type of time lag is not inconsistent with Ms. Coffey having incurred the disability in January 1990.

Sixth, the Board asserts that Dr. Emerson's records demonstrate that he did not begin treating Ms. Coffey's shoulder until January 17, 1990, almost two weeks after the accident. The Board claims this time lag is also inconsistent with the disability having been incurred on January 1, 1990. However, a closer examination of Dr. Emerson's notes reveals that the annotation the Board referenced is in fact a progress report on how Ms. Coffey's shoulder was improving. Such an annotation clearly indicates Dr. Emerson was in the process of treating a shoulder injury.

■ Seventh, the Board argues that Ms. Coffey's myofascial pain syndrome was a preexisting condition evidenced by Dr. Anderson's diagnosis of mild myofascial pain syndrome in 1987. However, this court has held that the existence of a preexisting condition will not bar an employee from receiving occupational disability benefits. "It is basic that an accident which produces injury by precipitating the development of a latent condition or by aggravating a preexisting condition is a cause of that injury." *Hester v. State, Pub. Employees Retirement Bd.,* 817 P.2d 472, 475 (Alaska 1991) (*citing* 22 Am. Jur.2d *Damages* § 280 (1988)).[9]

None of the foregoing arguments articulates any evidence which the Board could

reasonably have relied on to conclude that Ms. Coffey's disability was not the result of her occupational injury of January 1990. All of the Board's contentions focus on the credibility of testimony given. Not one of the Board's assertions offers a fact or piece of evidence which would contradict Ms. Coffey's claim that her disability is work related. All of the physicians, including those the Board asked Ms. Coffey to consult, related her condition directly or indirectly to the trauma suffered during the January 1990 injury.

*Yahara v. Construction & Rigging, Inc.,* 851 P.2d 69, 72 (Alaska 1993), provides that under the substantial evidence test this court will affirm the Board's decision where the Board is faced with conflicting medical opinions, and the Board elects to rely on one opinion rather than the other. However, this case is distinguishable from *Yahara* because, as we have already noted, the Board did not have conflicting medical opinions from which to choose. Although the Board correctly argues that this court should not substitute its judgment for the Board's own preference between competing medical opinions, the Board never references a single medical opinion contrary to Ms. Coffey's claim. In fact, there is a complete absence of contrary or conflicting medical opinion.

■ The Board further argues that there was substantial evidence for its decision because it rejected all of Ms. Coffey's proofs. It asserts that the trier of fact is entitled to disbelieve witnesses or otherwise discount their testimony. Credibility determinations made by the trier of fact are generally left undisturbed by this court on review. *See Richey v. Oen,* 824 P.2d 1371, 1376 (Alaska 1992); *Jackson v. White,* 556 P.2d 530, 532 n.

---

9. The causation standard which the Board might have applied is whether the occupational injury was a substantial factor in aggravating the preexisting condition. *See Hester v. State, Pub. Employees Retirement Bd.,* 817 P.2d 472, 475 (Alaska 1991) (citing *Delaney v. Alaska Airlines,* 693 P.2d 859, 863 (Alaska 1985) *overruled on other grounds, Wade v. Anchorage School Dist.,* 741 P.2d 634, 638–39 (Alaska 1987)). The employee bears the burden of establishing by a preponderance of the evidence that their work or a work related injury was a substantial factor in causing the disability. *Hester,* 817 P.2d at 475; *State, Pub. Employees Retirement Bd. v. Cacioppo,* 813

P.2d 679, 683 n. 6 (Alaska 1991). This is the causation standard used to determine worker's compensation benefits. We have held that it should also apply in occupational disability cases. *Hester,* 817 P.2d at 475. Under this causal standard occupational disability benefits can be awarded where the disability resulted from a work related aggravation of a preexisting condition. *Id.* Although the Board argues there is evidence of a preexisting condition (the early diagnosis of myofascial pain syndrome), the Board produces no evidence that the January 1990 incident was not a substantial factor in aggravating this condition.

4 (Alaska 1976). The Board cites *Innes v. Beauchene*, 370 P.2d 174 (Alaska 1962), for the proposition that where the trier of fact disbelieves a witness, that disbelief may, in fact, prove the opposite of the witness' testimony. The Board further insists that this court has applied this theory of evidence in reviewing administrative decisions. The Board contends that this court has held that substantial evidence supporting an administrative agency's findings of fact may take the form of circumstantial evidence or indirect proof. *See Commercial Fisheries Entry Comm'n v. Baxter*, 806 P.2d 1373, 1375 (Alaska 1991).

In *Innes*, we held the witness's demeanor may convince the trier of fact that the truth lies directly opposite of the statements of the witness, especially where the witness is interested in the outcome of the case. 370 P.2d at 177. However, there are two flaws with the Board's application of *Innes* to this case. First, the *Innes* court was concerned with allowing trial courts the discretion to be skeptical of testimony by biased or interested witnesses. The only interested witness to testify was Ms. Coffey; the testifying physicians were not interested parties. Second, this holding has nothing to do with whether merely discrediting all of the witnesses would constitute sufficient evidence for an administrative agency's decision.

*Baxter* is also distinguishable, because it involved a question of whether circumstantial evidence could constitute substantial evidence. 806 P.2d at 1375. In the case at bar the agency had no evidence, circumstantial or testimonial, upon which it based its decision.

## C. THE SUPERIOR COURT PROPERLY DECLINED TO REMAND THE CASE FOR FURTHER EVIDENTIARY PROCEEDINGS

 The superior court did not err in reversing the Board, rather than remanding the case to the Board for further evidentiary proceedings. The Board argues that the superior court had misgivings over the sufficiency of the Board's inquiry into the work relatedness of Ms. Coffey's disability. It claims that the superior court erred in deciding the issue in the face of such uncertainties.

The Board asserts that where the superior court finds that an administrative agency failed to consider an important factual issue, that issue is not to be decided by the superior court, but rather the case should be remanded to the agency for further fact finding. The Board advances a series of cases in which this court held that remand was necessary because the factual record was inadequate and further evidentiary hearings were needed: *Southeast Alaska Conservation Council v. State*, 665 P.2d 544 (Alaska 1983); *Arkanakyak v. State, Commercial Fisheries Entry Comm'n*, 759 P.2d 513 (Alaska 1988); *City of Nome v. Catholic Bishop of N. Alaska*, 707 P.2d 870 (Alaska 1985).

The Board correctly articulates the circumstances under which remand to an agency is appropriate. However, it fails to note that the case at bar is distinguishable from these cases. In each of the cases cited, this court clarified which interpretation of an agency rule or regulation should be applied to the given case. Remand was necessary for evidentiary hearings which applied the new rule. These further evidentiary proceedings were required because the agency had an incomplete record or had made insufficient findings of fact with regard to the newly settled law.

In *City of Nome*, we held that the superior court had properly remanded the case to the relevant administrative agency because equity required additional investigation. 707 P.2d at 877. The court concluded that the Board had made incomplete findings of fact because the Board awaited judicial clarification of the legal "mess" involved in the case. *Id.* In *Southeast Alaska Conservation Council*, we held that the superior court could have remanded to the agency if it found that the decisional document issued by the agency contained an inadequately reasoned explanation. 665 P.2d at 549. Similarly, in *Phillips v. Houston Contracting, Inc.*, 732 P.2d 544 (Alaska 1987), a case not discussed by the Board, we remanded the case after we determined how to interpret a rule. The Board had not made all of the findings of fact which were necessary to apply the new interpretation of this rule. *See Phillips*, 732 P.2d at 547. Likewise, in *Arka-*

*nakyak,* we remanded the case because we determined that an exception not previously considered by the court might be applicable. 759 P.2d at 517.

In the case at bar the superior court did not reverse due to the Board's failure to consider a factual issue, or because it found that the record needed to be supplemented with further fact finding. Instead, the superior court reversed the Board because even presuming that all of the inferences made by the Board were accurate, "there was still not substantial evidence to justify the Board's determination that Appellant's permanent disability was not caused by the work-related injury she suffered on January 1, 1990."

The Board contends that the following statement, which appears in a footnote to the superior court's order, demonstrates that the superior court found the fact finding incomplete, and therefore, should have remanded:

> Perhaps the lack of "substantial evidence" to support the Board's decision is a consequence of the fact that the focus of the hearing was the permanence of the injury rather than the cause of injury. The Board's decision on an issue that was not the focus of the dispute shifted the decision from what Appellant had successfully proved to what neither party had focused on and which was not really an issue. The court recognizes that the Board was free to review all aspects of appellant's claim. Though it may not technically violate due process for an agency to rule on a matter parties don't view as primary, one can see how a sense of fairness in the proceeding might be jeopardized.

Although this language emphasizes that the occupational relatedness of Ms. Coffey's injury was not the focus of the Board's hearing, the superior court does not assert that the Board did not make sufficient findings of fact as to this issue.

It is disingenuous for the Board to argue that this case should be remanded. This is not a case where necessary findings of fact were not made. The Board's "Findings of Fact and Conclusions of Law" include a section specifically noting the Board's ruling on the occupational nature of Ms. Coffey's injury:

> The Board finds that the Applicant failed to meet her burden of proof that her disability arises out of an occupational injury. After weighing the evidence presented by the Applicant and the Staff, the Board finds that the evidence does not preponderate in favor of finding the disability is occupational.

Additionally, the Board itself argues that all four elements of a disability claim were presented and argued at the hearing.[10] While making another point the Board even emphasizes that the counsel for the Board spent "a substantial amount of his argument pointing out the pre-existence of the very complaints which Coffey states originated on January 1, 1990." There is further evidence in the record that although the main focus of the hearing was on the permanency of Ms. Coffey's injury, the Board addressed questions about the etiology of Ms. Coffey's disorder to the different doctors who testified.

### D. THE SUPERIOR COURT DID NOT ERR IN COMMENTING THAT THE TESTIMONY OF ALL THE PHYSICIANS WAS CLEAR AND CONSISTENT

The Board argues that the superior court's finding that the medical evidence was "clear and consistent" exceeded the court's permissible scope of review.[11] The Board emphasizes that when conflicting medical opinions are present, deciding between the theories is a matter exclusively for the Board and not for the court. *See Hester v. State, Pub. Employee Retirement Bd.,* 817 P.2d

---

10. The four elements of the administrative decision tree:

 (1) Does a disability exist?
 (2) Is the disability permanent?
 (3) Is the disability caused by employment?
 (4) If the member is disabled what is the effective date of the disability?

11. Ms. Coffey argues that the superior court did not inject itself into the role of fact finder by holding that the medical evidence was clear and consistent because this finding was statutorily warranted by AS 44.62.570(c). However, as discussed in section III., C. of this opinion, AS 44.62.570(c) does not apply to a decision by this Board.

472, 477 (Alaska 1991). However, this case is distinguishable from *Hester* and its progeny because no conflicting medical evidence was produced relating to the issue of work relatedness. All of the physicians consulted either would not hypothesize about the source of Ms. Coffey's disability, or agreed that Ms. Coffey's disability was directly or indirectly caused by her occupational injury of January 1, 1990. The Board does not cite one physician's opinion which affirmatively contradicts Ms. Coffey's claims about the etiology of her disability.

### E. THE SUPERIOR COURT'S AWARD OF ATTORNEY'S FEES WAS NOT AN ABUSE OF DISCRETION

■ "Appellate Rule 508(e), rather than Civil Rule 82, controls any award of attorney's fees when the superior court determines an administrative appeal." *Diedrich v. City of Ketchikan,* 805 P.2d 362, 371 (Alaska 1991); *see also Kodiak W. Alaska v. Bob Harris Flying Serv.,* 592 P.2d 1200 (Alaska 1979); Alaska R.App.P. 601(b). Appellate Rule 508(e) provides that "[a]ttorney's fees may be allowed in an amount to be determined by the court." Thus, the superior court has broad discretion to award a party reasonable attorney's fees, and we will only reverse where there is an abuse of discretion. *See Cook Inlet Pipe Line Co. v. Alaska Pub. Util. Comm'n,* 836 P.2d 343, 348 (Alaska 1992). The superior court awarded Ms. Coffey $3,200.00 in attorney's fees and $2,056.00 in appellate costs. This award was within the discretion of the court. We affirm the superior court's award of attorney's fees to Ms. Coffey.

## IV. *CONCLUSION*

We AFFIRM the superior court's reversal of the Board's denial of permanent occupational benefits to Ms. Coffey. The superior court correctly concluded that substantial evidence did not support the Board's determination that Ms. Coffey's permanent disability was not caused by the work-related injury she suffered on January 1, 1990. The Board has not pointed to any evidence upon which it could have relied in concluding Ms. Coffey's disability was not occupationally related.

The superior court did not err by reversing rather than remanding this case. The superior court concluded that the lack of sufficient evidence was not the result of the Board failing to consider an important factual issue. Over fifteen physicians and health care providers testified at the hearing, and all who opined on the etiology of Ms. Coffey's disability related it to the January 1, 1990 incident. Thus, the Board had ample opportunity to, and in fact did, consider the factual issue in question.

The superior court did not exceed its authority or inject itself into the role of the trier of fact when it commented that the physicians' testimony was clear and consistent. All of the physicians who offered an opinion on the etiology of Ms. Coffey's disability testified that it was directly or indirectly caused by the occupational injury of January 1, 1990.

The superior court did not abuse its discretion in awarding attorney's fees and costs. The award of attorney's fees also is AFFIRMED.